IN THE UNITED STATES DISTRICT COURT
FOR THE ___SOUTHERN___ DISTRICT OF ___FLORIDA___
_____ DIVISION
*(Write the District and Division, if any, of the*
*court in which the complaint is filed.)*

FILED by _____ D.C.

JUN 1 9 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

---

CHRISTOPHER SHORTER #21344-017
_____
_____
_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

-against-

UNITED STATES OF AMERICA
_____
MARK S. INCH, BOP DIRECTOR
DR. DEBORAH G. SCHULT, DHD (AD)(HSD)
CONTINUED
*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*

REFERRED DIRECTLY TO THE HONORABLE
MARCIA. G. COOKE

**Complaint for Violation of Civil
Rights**
(Prisoner Complaint)

Case No. _____
*(to be filled in by the Clerk's Office)*

Jury Trial:   ☑ Yes   ☐ No
*(check one)*

cat / div _SSO / 1983 / MiA_
Case # _____
Judge _____ Mag _WHITE_
Motn Ifp _YES_ Fee pd $ _O_
Receipt # _____

---

## NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public
access to electronic court files. Under this rule, papers filed with the court should *not* contain: an
individual's full social security number or full birth date; the full name of a person known to be a minor; or
a complete financial account number. A filing may include *only*: the last four digits of a social security
number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account
number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or
any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to
proceed in *forma pauperis.*

PAGE 1 CONTINUED

DR. JEFFERY D. ALLEN, MD, BOP MEDICAL DIRECTOR
TRANSGENDER CLINICAL CARE TEAM, (TCCT), BOP (HSD)
J.A. KELLER, SERO DIRECTOR
CDR TODD CRAWFORD, SERO, (HSD) ADMINISTRATOR
DR. ANGEL ORTIZ, MD, SERO, MEDICAL DIRECTOR,
        DEFENDANT(s)

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | CHRISTOPHER SHORTER |
| All other names by which you have been known: | CHRISSY, CHRIS |
| | CHRISSY |
| | CHRIS |
| ID Number | 21344-017 |
| Current Institution | MIAMI FCI |
| Address | PO BOX 779800 |
| | MIAMI, FL 33177 |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | UNITED STATES OF AMERICA |
| Job or Title (if known) | |
| Shield Number | |
| Employer | FEDERAL BUREAU OF PRISONS |
| Address | 950 Pennsylvania Avenue, NW(Suite 4322) |
| | Washington, DC 20530-0001 |

☑ Individual capacity        ☑ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | MARK S. INCH |

2



| Job or Title (if known) | FEDERAL BUREAU OF PRISONS DIRECTOR |
|---|---|
| Shield Number | |
| Employer | FEDERAL BUREAU OF PRISONS |
| Address | 320 1st Street, NW |
| | WASHINGTON, DC 20534 |

☑ Individual capacity     ☑ Official capacity

**Defendant No. 3**

| Name | DR. DEBORAH G. SCHULT |
|---|---|
| Job or Title (if known) | DHD, ASSISTANCE DIRECTOR HEALTH SERVICE DIVISION |
| Shield Number | |
| Employer | FEDERAL BUREAU OF PRISONS |
| Address | 320 1st Street, NW |
| | WASHINGTON, DC 20534 |

☑ Individual capacity     ☑ Official capacity

**Defendant No. 4**

| Name | DR. JEFFERY D. ALLEN |
|---|---|
| Job or Title (if known) | BOP MEDICAL DIRECTOR |
| Shield Number | |
| Employer | FEDERAL BUREAU OF PRISONS |
| Address | 320 1st Street, NW |
| | WASHINGTON, DC 20534 |

☑ Individual capacity     ☑ Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

3

<u>PAGE 3 II. BASIS FOR JURISDICTION CONTINUED</u>

II.      Basis for Jurisdiction

[28 USCS §§ 1346(b) and 2672]

PAGE 3 CONTINUED

Defendant No. 5

     Name                   TRANSGENDER CLINICAL CARE TEAM, (TCCT)
     Job or Title        TRANSGENDER CLINICAL CARE TEAM, (TCCT)
     Shield Number
     Employer            FEDERAL BUREAU OF PRISONS
     Address             320 1st Street, NW
                      WASHINGTON, DC 20534

     ✓ Individual capacity        ✓ Official capacity

Defendant No. 6
     Name                   J.A. Keller
     Job or Title        Southeast Regional Director
     Shield Number
     Employer            FEDERAL BUREAU OF PRISONS
     Address             3800 Camp Creek PKWY SW
                      Building 2000
                      ATLANTA, GA 30331

     ✓ Individual capacity        ✓ Official capacity

Defendant No. 7
     Name                   Todd Crawford
     Job or Title        CDR, Southeast Regional Health Services
                      Division Administrator
     Shield Number
     Employer            FEDERAL BUREAU OF PRISONS
     Address             3800 Camp Creek PKWY SW
                      Building 2000
                      ATLANTA, GA 30331

     ✓ Individual capacity        ✓ Official capacity

Defendant No. 8
     Name                   Dr. Angel Ortiz
     Job or Title        MD, Southeast Regional Medical Director
     Shield Number
     Employer            FEDERAL BUREAU OF PRISONS
     Address             3800 Camp Creek PKWY SW
                      Building 2000
                      ATLANTA, GA 30331

     ✓ Individual capacity        ✓ Official capacity

A.    Are you bringing suit against *(check all that apply)*:

☑    Federal officials (a *Bivens* claim)

☐    State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

N/A
_____
_____
_____

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Eighth Amendment Claim
_____
_____
_____

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Each of the Supervisory/Non-Examining Physician(s) are
hindering adequate medical care prescribed by Plaintiff's
Specialist Treating Physician-(Dr. Christopher Estes, OBGYN/
CMO, Specialist Examining Physician-(Dr. Eugenio    --CONTINUE

III.    **Prisoner Status**

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

☐    Pretrial detainee

☐    Civilly committed detainee

☐    Immigration detainee

4

<u>PAGE 4 CONTINUED</u>

D.    CONTINUED

Angueira-Serrano, MD), Primary General Treating Physician-(Dr. Inerio
Alarcon, MD/CD) and General Treating Physician-(Dr. Marta Chipi, MD).

    Specifically, Plaintiff asserts that each of the defendants are
hindering adequate medical care prescribed by Dr. Christopher Estes,
OBGYN/CMO, who is a Transgender Specialist for Plaintiff's diagnosed
serious medical condition of GENDER DYSPHORIA.   Plaintiff's Specialist
Examining Physician-(Dr. Eugenio Angueira-Serrano, MD), co-signed and
agreed with the surgical interventions prescribed by Transgender
Specialist, Specialist Treating Physician-(Dr. Christopher Estes,
OBGYN/CMO).   The local Miami FCI institution doctor(s): Primary General
Treating Physician-(Dr. Inerio Alarcon, MD/CD and General Treating
Physician-(Dr. Marta Chipi, MD) have also adopted Specialist Treating
Physician-(Dr. Christopher Estes, OBGYN/CMO) prescribed surgical
interventions and have submitted each to the Supervisory/Non-Examining
Physician(s) for approval, however each of the defendant(s) have denied
each of the surgical intervention request(s) due to non-medical
considerations negligently and deliberately under the color of state/
federal law.   The defendant(s) provides that the Bureau of Prisons
Transgender Clinical Care Team, (TCCT) is reviewing Plaintiff's case
for a final disposition, however the (TCCT) have been reviewing
Plaintiff's prescribed surgical intervention request(s) since 2/2017,
well over (16) months and have yet to issue a final determination.

☐     Convicted and sentenced state prisoner

☑     Convicted and sentenced federal prisoner

☐     Other *(explain)* _____

## IV.    Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    If the events giving rise to your claim arose outside an institution, describe where and when they arose.

N/A

_____

_____

B.    If the events giving rise to your claim arose in an institution, describe where and when they arose.

Miami FCI from 2/2017-----Present.

_____

_____

C.    What date and approximate time did the events giving rise to your claim(s) occur?

From 2/2017-----Present.

_____

_____

D.    What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

See attached detailed Statement of Claim

_____

_____

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

VIOLATION OF EIGHTH AMENDMENT RIGHTS

Failure to provide clinically appropriate prescribed medical treatment for Plaintiff's serious medical condition GENDER DYSPHORIA. Each of the Supervisory/Non-Examining Physician Defendant(s) are deliberately standing in Plaintiff's way of receiving prescribed medical treatment. The Defendant(s) continues to ignore and/or deny each surgical intervention request prescribed by Plaintiff's Transgender Specialist Treating Physician- (Dr. Christopher Estes, OBGYN/CMO). Specifically, Miami FCI institution doctor(s): Dr. Inerio Alarcon, MD/CD is Plaintiff's Primary General Treating Physician. Dr. Marta Chipi, MD, is a Staff Physician and is also Plaintiff's General Treating Physician. Dr. Christopher Estes, OBGYN/CMO, is Plaintiff's Transgender Specialist Treating Physician for Plaintiff's serious diagnosed medical condition of GENDER DYSPHORIA. Dr. Eugenio Angueira-Serrano, MD is Plaintiff's transgender Specialist Examining Physician for Plaintiff's diagnosed medical condition of GENDER DYSPHORIA.

Plaintiff's Primary General Treating Physician, General Treating Physician, Transgender Specialist Treating Physician and Transgender Specialist Examining Physician are all in agreement with the course of treatment prescribed on 7/13/2017 and 9/28/2017 by Transgender Specialist Treating Physician Dr. Christoper Estes, OBGYB/CMO. Due to the Bureau of Prisons Delegation of Authority, Health Services Division, Organizational chart, Plaintiff's Non-Examining Physician(s), (Supervisory/Medical BOP Employees---The Defendant(s), have repeatedly denied and/or ignored Plaintiff's prescribed surgical intervention due to Non-Medical reasons and an custom and policy of not providing Transgender Inmates diagnosed with Gender Dysphoria surgical interventions. Gender Dysphoria, formerly known as "gender identity disorder", is a medical condition characterized by clinically significant distress resulting from the misalignment between a person's gender identity-one's innate sense of belonging to a particular gender-and the sex the person was assigned at birth. Gender Dysphoria is a condition recognized by the American Medical Association, the American Psychological Association, the American Psychiatric Association (in the Diagnostic and Statistical Manual of Mental Disorders, Fifth ed. (2013)("DSM-V"), the World Health Organization and the National Commission on Correctional Healthcare, who recommends that the medical management of prisoners with Gender Dysphoria should follow the "WPATH" Standards of Care. The World Professional Association for Transgender Health, ("WPATH"), is the leading medical authority on gender dysphoria and has developed Standards of Care for the treatment of the condition. The Standards of Care are recognized as authoritative by every major medical and mental health association. The Standards of Care provide for the following treatments, some or all of which will be required depending on the needs of the individual patient:

## PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

(1) Social transition, or "[c]hanges in gender expression and role" (i.e.) dressing, grooming and otherwise outwardly presenting oneself in a manner consistent with one's gender identity");

(2) Hormone therapy ("medically indicated" for persons "with persistent and well-documented gender dysphoria") for persons without a medical contraindication for hormone therapy treatments;

(3) "surgery to change primary and/or secondary sex characteristics"; and

(4) Psychotherapy

The Standards of Care are clear that treatment for gender dysphoria in institutional settings can and should follow the same protocols as available in the community.

The Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline co-sponsored by ("WPATH") the World Professional Association for Transgender Health, provides clinical guidelines for Endocrinologists to provide safe and effective hormone regimen that will (1) suppress endogenous sex hormone secretion determined by the person's genetic/gonadal sex and (2) maintain sex hormone levels within the normal range for the person's affirmed gender.

Plaintiff's Primary General treating Physician, General Treating Physician, Transgender Specialist Treating Physician, and Transgender Specialist Examining Physician, are treating Plaintiff according to the Community Standards dictated by ("WPATH"), the World Professional Association for Transgender Health and the Endocrine Society Clinical Practice Guideline which is co-sponsored by the World Professional Association for Transgender Health, however Plaintiff's Non-Examining Physician(s)/Supervisory Defendant(s), has repeatedly refused to allow Plaintiff to receive prescribed medical treatment(s). Specifically:

On 2/9/2012, Plaintiff was arraigned for the charges currently incarcerated on. At Plaintiff's arraignment the HONORABLE Robert Hinkle, District Judge called court to order. When Plaintiff was called and requested to stand, the HONORABLE Robert Hinkle said Has there been a mistake? I have a woman before me but the docket says Christopher Shorter, please help me understand". Plaintiff was allowed to tell the Judge that she was Christopher Shorter, however I am Transgender and live full time as a woman." HONORABLE Judge Hinkle said, "ok, I understand because you clearly are a woman, for the record this court will refer to you as a woman."

Plaintiff entered the BOP living full time as a woman which hasn't changed. Plaintiff started living full time as a woman in 2008. A copy of Plaintiff's Diver License is attached showing Plaintiff's appearance as woman, however at the time Plaintiff had not met the requirements to have the sex marker changed on said driver's license. Plaintiff

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

will only be able to change sex marker on driver license after sex reassignment  surgery
per applicable Florida Law.

On 10/2/2014, while housed at Oakdale FCC, Plaintiff was officially diagnosed
per the Bureau of Prisons Program Statement 6031.04 with a diagnosis of GENDER DYSPHORIA
by Chief Psychologist/PsyD Barbara Moorehead.  Plaintiff was referred to medical and
psychiatric staff to establish a treatment plan for GENDER DYSPHORIA.  As noted in the
Summary Care Formulation, "He produced laminated pictures and an album which he said
helps to ground his self-concept while he is in this prison environment where it is
difficult to dress and present himself comfortably as he had before incarceration.
He also said that for seven years, he had been taking the over-the-counter hormones
to alter his features from more masculine to feminine appearance.  His mannerisms
are more consistent with females than males and his interests and associations are
similarly more feminine than masculine."

This is the earliest record in the Bureau Electronic Medical Records(BEMR) to
support that Plaintiff lived full time as woman regardless of the environment.  Prison
has been no exception. (See attached)

On 12/15/2014, Plaintiff was prescribed Spironolactone 50 mg Tablets as a
testosterone suppressant consistent with the Endocrine Treatment of Transsexual Persons:
An Endocrine Society Clinical Practice Guideline which recommends Hormone Regiments in
Transgender Persons specifically (MTF) Male to Female-Anti-androgen Therapy (Spironolactone
100-300 mg/daily). (See Attached Clinical Encounter/Endocrine Society Clinical Practice
Guideline)

On 5/29/2015, Plaintiff was approved to receive Estrogen therapy(Estradiol Patch),
consistent with the Endocrine Treatment of Transsexual Persons: An Endocrine Society
Clinical Practice Guideline which recommends Hormone Regiments in Transgender Persons
specifically (MTF) Male to Female-Estrogen(Estradiol Transdermal patch 0.025-0.2 mg/daily
with a new patch placed every 3-5 days. (See attached Clinical Encounter dated 6/4/2015/
Endocrine Society Clinical Practive Guidelines).

On 6/17/2015, Plaintiff received her first Estradiol Transdermal patch.

On 4/4/2016, General Treating Psychiatrist-(Dr. Todd Cornett, MD, requested
consultation with Endocrinologist Dr. Eugenio Angueira for evaluation for Plaintiff's
serious medical condition of Gender Dysphoria consistent with ("WPATH"), the World
Professional Association For Transgender Health, XIV.  Applicability of the Standards of
Care to People Living in Institutional Environments, which clearly states, The SOC in
their entirety apply to all transsexual, transgender, and gender nonconforming people,
irrespective of their housing situation.  If the in-house expertise of health
professionals in the direct or indirect employ of the institution does not exist to

Page 4

assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care." (See attached Clinical Encounter/("WPATH") Standards of Care)

On 4/8/2016, General Treating Psychiatrist-(Dr. Todd Cornett, MD, made an amendment to Bureau of Prisons Health Services Clinical Encounter-Administrative Note dated 4/4/2016. (See attached)

On 4/19/2016, Plaintiff was seen by Primary General Treating Physician-(Dr. Inerio Alarcon, MD/CD. Plaintiff informed Dr. Alarcon, MD/CD about Lump in right breast. A Ultrasound was ordered for screening for cyst or mass. (See attached)

On 4/20/2016, Primary General Treating Physician-(Dr. Alarcon, MD/CD, made an amendment to Bureau of Prisons Health Services Clinical Encounter dated 4/19/2016. (See attached)

On 4/26/2016, Plaintiff was referred for a Suicide Risk Assessment for intense feelings of Dysphoria which was causing Plaintiff to have Suicidual Ideation, Emotional Distress, Excessive Preoccupation with Genital Mutilation and Self-Castration. Plaintiff was evaluated by psychology services. A formal suicide watch was not warranted. However, it was noted that Plaintiff endorsed recurrent thoughts of self-castration. (See attached)

On 5/9/2016, Primary General Treating Physician-(Dr. Alarcon, MD/CD, prescribed Plaintiff Medroxyprogesterone 5mg Tablets to facilitate breast growth consistent with both the Endocrine Society Clinical Practice Guideline and ("WPATH"), Standards of Care. (See attached)

On 5/13/2016, Plaintiff was seen by Transgender Examining Specialist -(Dr. Eugenio Angueira-Serrano, MD, for evaluation. Plaintiff's Spironolactone was increased to the max dosage of 300mg daily. Plaintiff's Estrogen(Estradiol was increased to 4mg pill daily. Plaintiff prescribed treatment was consistent with both the Endocrine Society Clinical Practice Guideline and ("WPATH"), Standards of Care. (See attached)

On 5/24/2016, Plaintiff had prescribed Breasts Ultrasound which revealed, "Right breast Mass. Suggest surgical consultation and biospy." (See attached)

On 6/21/2016,  consultation Request submitted for General Surgery for breast mass. (See attached)

On 8/25/2016, Plaintiff had a follow-up Breast Ultrasound, Mammogram and Bone Density study. (See attached)

On 8/26/2016, Plaintiff had follow-up visit with General Treating Physician-(Dr. Marta Chipi, MD, where it was noted, "Patient went to Larkin Imaging yesterday for Mammo, Bone Density and Breast Ultrasound with dedicated focal views. Results not available at this time.  Surgical consult scheduled for further evaluation and

<u>PAGE 5 IV. STATEMENT OF CLAIM CONTINUED</u>

recommendations soon.  Patient has strong family history of breast cancer. 2 sisters
passed away in their 30's from this ailment.  Counseling on hormone replacement,
possible findings, and further treatment options explored; patient is open and receptive
to different management modalities as needed, such as breast implants, surgical castration,
minimal hormal manipulation." (See attached)

On 9/6/2016,  Plaintiff had right breast mass surgical consult, "please arrange
for surgical scheduling ASAP". (See attached)

On 9/22/2016, Plaintiff had right breast lumpectomy with reconstruction. "This
is a 38-year-old male to female transgender on hormone replacement therapy who presented
to the clinic with a right breast mass.  Imaging was not suspect of this mass, however,
due to patient's strong family history of breast cancer as well as hormone replacement
therapy, the decision was made to do a lumpectomy of this right breast mass." (See Attached)

On 10/13/2016, Plaintiff had follow-up after breast lumpectomy on 9/22/2016.
"Assessment: -38 yo transgender, undergoing hormonal therapy for male-female transition.
Currently on hormonal treatment with R breast mass, b/l gynecomastia, s/p right breast
lumpectomy 9/22/2016 -bx positive for florid lobular hyperplasia, and PASH(Focal
Pseudangiomatose Stromal Hyperplasia) Plan: Results of biopsy were explained to patient.
The mass was negative for malignancy, however was positive for lobular hyperplasia
which is not usually seen with gynecomastia. -With this finding, plus the pt's strong
family hx of breast cancer as well as her hx of long term hormone replacement therapy,
we recommend that the patient gets genetic testing. Prescription for genetic testing
is in chart. This was discussed with the patient, and the patient agreed that if BRCA
positivity were to occur the HRT must be stopped and prophylactic bilateral mastectomy
will be performed -Follow up after genetic testing result." (See attached)

On 10/28/2016, Plaintiff had BRCA Labs drawn.  BRCA negative, however only major
Ashkenazi Mutations tested. (See attached)

On 11/17/2016, Plaintiff was treated at Jackson South Community Hospital. ED-Note-
Physician, "patient present with chest pains. Diagnosis:  Pleuritic Chest Pain, Atypical
Chest Pain, Abdominal Pain, Sinus rhythm with 1st degree A-V block, Nonspecific T Wave
abnormality, Abnormal ECG." (See attached)

On 12/16/2016, Plaintiff discontinued Estradiol/Medroxyprogesterone therapy due to
complications.  Contraindicated from further Estrogen/Progesterone therapy consistent
with the Endocrine Society Clinical Practice Guideline and ("WPATH"), Standards of
Care. (See attached)

On 2/15/2017, Plaintiff was seen for a Suicide Risk Assessment in psychology
services, specifically an inmate reported that "inmate Shorter had expressed a desire
to remove her testicles in an effort to commit suicide." A formal suicide watch was
determined not to be warranted. (See attached)

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

On 2/23/2017, Tele-Conference Meeting: (Clinical Director, Chief Psychiatrist, Medical Doctor, BOP Endocrinology Transgender Team) A Teleconference Meeting held on 02/22/17 at 903 in the clinical Director Office to discuss inmate Shorte's medical request (Orchiectomy).  During the meeting the Endocrinology was informed that inmate Shorter was on hormonal therapy for more than 1 years, but he refused to continue on medication due to side effect so inmate request Orchiectomy.  The new guideline for transgender was discussed and he needs to be on hormonal therapy for almost 1 yea, and enough time on sentence to wait for possible surgery if he qualify.  At time the personal in Central Office are working with different agency to elaborate a plan for surgical and post-surgical care."  This information and discussion is in direct contrast to the dictates of the Endocrine Society Clinical Practice Guideline and ("WPATH"), Standards of Care, VIII Hormone Therapy, "Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications."  Plaintiff's individualized health complications with taking Estrogen/Progesterone therapy proved to be detrimental to Plaintiff's health therefore was medically contraindicated consistent with the Standards of Care. (See attached)

On 2/27/2017, General Treating Physician-(Dr. Marta Chipi, MD), noted, "Patient discussed in the AM morning Report meeting-Awaiting local Transgender Specialist consult for further recommendations.  Ordering lab work in preparation for Specialist visit." (See attached)

On 2/27/2017, Primary General Treating Physician-(Dr. Alarcon, MD/CD), noted, Amendment made to Administrative Note dated 2/23/2017. (See attached)

On 2/27/2017, Informal Resolution Request #908238 submitted. (See attached)

On 3/13/2017, Plaintiff was seen by Transgender Treating Specialist-(Dr. Christohper Estes, OBGYN/CMO), to discuss transgender treatment options.  "Assessment 1. Male to Female Gender Indentity, poor progress in transition, 2. History of florid hyperplasia of right breast, 3. Family History of breast cancer, BRCA negative Plan 1. Given history of florid hyperplasia of breast following estrogen/progesterone treatment, the patient's risk for breast cancer under the influence of continued E/P treatment is significantly increased.  Patient's sister had negative BRCA test and pt had negative BRCA test (though only major Ashkenazi mutations tested).  The patient's gender transition remains poorly addressed. I discussed the following options for treatment: a. Re-start hormonal therapy (E/P) with the knowledge that intensive, regular screening with Ultrasound and MMG would be needed and that a Breast CA could develop and she would then need to stop therapy and treat the CA as appropriate; b. Add Depo Lupron; c. Add finasteride; d. Consider orchiectomy if medical therapies do not help.  For now, patient wants to start finasteride and observe.  Will begin at 1mg daily, continue x6

<u>PAGE 5 IV. STATEMENT OF CLAIM CONTINUED</u>

weeks and assess response.  Continue Spironolactone at same dose
2. Follow up with me in 6 weeks.  Check labs before next visit: free/total Testosterone,
estrogen; SHBG, Prolactin, CBC, CMP/
3.  If response is not adequate, consider increasing dose of finasteride at that time.
4.  If medical therapies reach their maximum dose limits, will refer for evaluation by
Urology or Plastic Surgery for Orchiectomy."
Patient is poor candidate for Estrogen/progesterone therapy. Requests alternative."
<u>Transgender Treating Specialist</u>-(Dr. Christopher Estes, OBGYN/CMO), prescribed orders
are consistent with both the Endocrine Society Clinical Practice Guideline and ("WPATH"),
Standards of Care.  (See attached)

On 3/9/2017, Plaintiff submitted Request For Administrative Remedy Appeal #908238-F1.
(See attached)

On 4/20/2017, Plaintiff was seen by, <u>Transgender Specialist Treating Physician</u>-(Dr.
Christopher Estes, OBGYN/CMO),  "Chief Complaint: Persistent gender dysphoria, "feeling
badly about myself in regards to my gender transition." "Assessment and Plan: 1.
Gender dysphoria.  The patient has recently begun the finasteride therapy.  Due to the
short duration of use, I would not alter the dose of medication at this time.  Rather,
I would continue the patient at the current dose of 1 mg daily........." 2. Gender
transition.  The patient expressed a desire to proceed with orchiectomy and breast
augmentation. I counseled the patient that orchiectomy is a permanent surgery and as
such, per the WPATH guidelines, requires 2 letters from mental health professionals
confirming that the patient has gender dysphoria, which warrants and is an appropriate
candidate for permanent surgery.  I recommend that the patient obtain these appropriate
consults at this time so that when it is appropriate time to make the referral for
surgery, she has been prepared and ready to go.  The patient voices understanding.
I will discuss this with her counselor in the prison system and will report back on
progress at the next visit." <u>Transgender Specialist Treating Physician</u>-(Dr. Christopher
Estes, OBGYN/CMO), prescribed orders are consistent with both the Endocrine Society
Clinical Practice Guideline and ("WPATH"), Standards of Care. (See attached)

On 5/8/2017, Tele-Conference Meeting: (Clinical Director, Chief Psychiatrist,
BOP Medical Director, BOP Endocrinology Transgender Clinical Care Team). Plaintiff's
prescribed surgery request(s) was discussed, however tabled a no decision was made one
way or the other.

On 7/13/2017, Plaintiff was seen by <u>Transgender Specialist Treating Physician</u>-(Dr.
Christopher Estes, OBGYN/CMO), "Pt was seen by me for follow up of GID.  Pt reports
no change in gender dysphoria symptoms on current medical Rx.  Assessment: Gender
Identity disorder/dysphoria, not improved  Plan: 1. Labs reviewed and essentially stable

## PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

from last assessment. Continue Spironolactone at current dose. Increase finasteride
5 mg daily. F/u response in 6 weeks, check labs before next visit. 2. Pt is a poor
candidate for hormonal tx due to history. Desires definitive surgery for gender
confirmation. With this will come orchiectomy which will improve hormonal profile.
Pt needs referral to plastic surgeon for full consultation regarding surgical options.
Will arrange before next visit for surgical planning. Refer to Dr. Gregory Dowbak
for evaluation for Orchiectomy and Top Surgery. This is necessary to address persistent
gender dysphoria. Obtain letter from Psychiatry for permanent surgery." Upon Plaintiff's
return to the institution with this information General Treating Psychiatrist-(Dr. Todd
Cornett, MD), confirmed Plaintiff's appropriateness for permanent surgery to
Transgender Specialist Treating Physician-(Dr. Christopher Estes, OBGYN/CMO). Transgender
Specialist Treating Physician-(Dr. Christopher Estes, OBGYN/CMO), prescribed orders
are consistent with both the Endocrine Society Clinical Practice Guideline and ("WPATH"),
Standards of Care. (See attached)

   On 7/13/2017, a Plastic Surgery Consultation Request was submitted. Reason for
Request: Refer to Dr. Gregory Dowbak plastic surgery doctor for evaluation for orchiectomy
and top surgery." (See attached)

   On 7/25/2017, in a multi-disciplinary hearing each of the defendant(s) except BOP
Director Mark S. Inch, denied Plaintiff's prescribed surgical intervention request(s)
prescribed by Transgender Specialist Treating Physician-(Dr. Christopher Estes, OBGYN/CMO),
on 7/13/2017 for non-medical reasons contrary to both the Endocrine Society Clinical
Practice Guideline and ("WPATH"), Standards of Care. (See attached)

   On 7/20/2017, Plaintiff was approved to purchase the Breast Forms prescribed on
7/13/2017, by Transgender Specialist Treating Physician-(Dr. Christopher Estes, OBGYN/CMO).
(See attached)

   On 9/28/2017, Plaintiff was seen by Transgender Specialist Treating
Physician-(Dr. Christopher Estes, OBGYN/CMO), "Pt is here today to f/u on
hormonal management of gender transition. She reports continued gender/
genital dysphoria through the associated anxiety has improved. Continues
to strongly desire orchiectomy to complete transition and improve hormonal
status. Assessment 1. Gender identity disorder/gender dysphoria
Plan Patient is currently on max dose of meds with some response, but
not to an acceptable level. Discussed option of course of depo-lupron.
Pt informed it may have side effects such as hot flashes, insomnia and
anxiety. Pt declines as she does not want more medications or to risk
side effects. Labs not repeated since last visit. Re-check CBC, CMP,
free/total estrogen, testosterone, progesterone. TSH in 2 weeks. Patient

<u>PAGE 5 IV. STATEMENT OF CLAIM CONTINUED</u>

needs referral to Dr. Dowbak for evaluation for orchiectomy.  Obtain
consult with Dr. Gregory Dowbak as previously requested ASAP."
<u>Transgender Specialist Treating Physician</u>-(Dr. Christopher Estes, OBGYN/
CMO), prescribed orders are consistent with both the Endocrine Society
Clinical Practice Guideline and ("WPATH"), Standards of Care.  (See attached)

On 9/29/2017, a Specialty Procedure Consult was submitted.  Reason
for Request:  Endocrinologist requested consult with Dr. Gregory Dowback
for Orchiectomy."

On 10/2/2017, in a multi-disciplinary hearing each of the defendant(s)
except BOP Director Mark S. Inch, denied Plaintiff's prescribed surgical
intervention request(s) prescribed by <u>Transgender Specialist Treating</u>
<u>Physician</u>-(Dr. Christopher Estes, OBGYN/CMO), on 9/28/2017. <u>Transgender</u>
<u>Specialist Treating Physician</u>-(Dr. Christopher Estes, OBGYN/CMO), prescribed
orders are consistent with both the Endocrine Society Clinical Practice
Guideline and ("WPATH"), Standards of Care.  (See attached)

On 10/19/2017, <u>General Treating Physician</u>-(Dr. Marta Chipi, MD),
Administrative Note 1, Consult-Endocrinologist requested consult with
Dr. Gregory Dowback for Orchiectomy:  Refer up to Region by Alarcon, MD/CD
Comments:  Inmate transgender male to female has been follow up by
endocrinologist since last year.  Inmate was recommended for orchiectomy.
Defer by Thomas, RNC/Mast RN Regional Review"  (See attached)

On 10/20/2017, Regional defendant(s) denied <u>General Treating Physician</u>-
(Dr. Martha Chipi, MD), request dated 10/19/2017. (See attached)

On 10/25/2017, Dr. Sherri Skibinski, PsyD/DAP, noted, "Met briefly
with inmate SHORTER to give her a response to her question regarding
whether or not the Transgender Committee had made a decision regarding
her receiving Gender Reassignment Surgery.  The author informed inmate
SHORTER that I had received an email reply from the head of the Female
Offender Branch indicating the following: "This surgery request has been
discussed, but it was not approved or denied at this point." (See attached)

On 11/15/2017, <u>General Treating Physician</u>-(Dr. Marta Chipi, MD), noted,
"Patient 39 year old for routine CCC follow-up. ....... Continues with
gender dysphoria symtoms-dislikes masculinity and his genitalia. ROS
Comments  Patient brings in pictures of himself  from a time period prior
to incarceration, where he appears dressed as a female. (See attached)

On 11/15/2017, Clinical Encounter-Administrative Note by, Ford,Rochelle
HSA/RDH, "Admin Note- General Administrative Note encounter performed at

<u>PAGE 5 IV. STATEMENT OF CLAIM CONTINUED</u>

Other.  Administrative Note 1  Bi-annual Assessment of Transgender/Intersex
meeting held today. No medical issues with inmate  Shorter at this time.
Plaintiff's surgical invention(s) request(s) prescribed by <u>Transgender</u>
<u>Specialist Treating Physician</u>-(Dr. Christopher Estes, OBGYN/CMO) was
not discussed much less approved.  (See attached)

> On 12/20/2017,"a multidisciplinary meeting at the Warden conference
room to ventilates any concerns of inmate Shorter."  Plaintiff's surgical
invention(s) request(s) prescribed by <u>Transgender Specialist Treating</u>
<u>Physician</u>-(Dr. Christopher Estes, OBGYN/CMO) was not approved. (See attached)

> On 1/5/2018, Plaintiff had an Office Visit with <u>Transgender Specialist</u>
<u>Examining Physician</u>-(Dr. Eugenio Angueira-Serrano, MD), who noted,
Assessment: MTF Transsexual Person on Hormone Therapy -patient with
contraindication to further estrogen therapy, -testosterone not suppressed
despite max dose spironolactone and finasteride, -Agree with previous
recommendation to proceed with surgical interventions, -will start lupron
at this time as a temporary measure to help alleviate symptoms while
waiting for surgery to be performed.  Lupron is to be discontinued upon
surgical intervention.  Attending Note:  1. Transgender:  The patient has
a contraindication for estrogen therapy so only antiandrogen therapy
can be done.  I will start her on lupron to suppress endogenous testosterone
production as a temporary measure until she undergoes orchiectomy which
is the best treatment at this time.  Orders:  Doc'd D/C Estradiol 1 mg
Tab 4 tablet orally daily because: developed breast lumps(Eugenio
Angueira-Serrano, M.D.)  New  Lupron Depot (1-month) 7.5 mg Kit
Intramuscularly every 30 days #1 kit RFx6)"  <u>Transgender Specialist</u>
<u>Examining Physician</u>-(Dr. Eugenio Angueira-Serrano, MD), prescribed orders
are consistent with both the Endocrine Society Clinical Practice Guideline
and ("WPATH"), Standards of Care.  (See attached)

> On 1/8/2018, Plastic Surgery, Reason for Request: Inmate transgender
evaluated by endocrinologist specialist and recommended inmate undergo
orchiectomy and top surgery.  (See attached)

> On 2/15/2018, in a multi-disciplinary hearing each of the defendant(s)
denied Plaintiff's prescribed  surgical intervention request(s) prescribed
by <u>Transgender Specialist Treating Physician</u> (Dr. Christopher Estes, OBGYN/
CMO), on 7/13/2017 and 9/28/2017 then co-signed by <u>Transgender Specialist</u>
<u>Examining Physician</u>-(Dr. Eugenio Angueira-Serrano, MD), on 1/5/2018.
The prescribed orders of both <u>Transgender Specialist Treating Physician</u>-

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

(Dr. Christopher Estes, OBGYN/CMO) and <u>Transgender Specialist Examining Physician</u>-(Dr. Eugenio Angueira-Serrano, MD) are consistent with both the Endocrine Society Clinical Practice Guideline and ("WPATH"), Standards of Care.  (See attached)

On 4/18/2018, Clinical Encounter noted, "Inmate complaints of side effects of medication Lupron.  He complaints of chest pains, tachycardia, hot flashes, nausea, increased sweating and tiredness.  Inmate requesting follow up consult with specialist.  EKG done.  Inmate evaluated by physician. (See attached)

On 4/20/2018, Endocrinology Consultation submitted.  Reason for Request:  Case discussed with RN-Inmate complaints experiencing side effects of medication: leuprolide acetate injection- Lupron.  Patient requesting follow-up with his specialist. last Endo eval Jan 2018 with recommendations for follow-up PRN.  Lupron started as a temporary measure to aliviate symptoms while awaiting permanent treatment." (See attached)

On 4/28/2018, Clinical Encounter  Chief Complaint:  Chest Pain "Inmate complaints of chest pains and troubled breathing.  Assessment: Alteration in comfort  Inmate stated experiencing side effects of medication: Lupron.  He stated experiencing troubled breathing, tightness in the chest, numbness on left arm, fast heartbeat, and weakness." (See attached)

On 5/1/2018, Endocrinology Consultation submitted, Reason for Request: Case discussed with CD inmate complaints experiencing  side effects of medication: leuprolide acetate injection- Lupron.  Patient requesting to follow-up with his specialist. last Endo eval Jan 2018 with recommendations for follow-up PRN.  Lupron started as a temporary measure to aliviate symptoms while awaiting permanent treament. Pt. describes a intermittent, sharp, discomfort began about two months ago, after the second and third injection of Lupron; patient He stated experiencing troubled breating, tightness in the chest, numbness on left arm, fast heartbeat, and weakness." (See attached)

On 5/3/2018, Endocrinology Consultation submitted, Reason for Request: 39 year old inmate has a history of Gender Disorder.  Today inmate comesto HSU to report multiples complaints as follows:

1-"Inmate states I had been feeling sick since 3rd dose of Lupron on March 16, 2018. "I fell like chest pain, hot flashes, night sweat, nauseas and sometime vomits after the injection.  Inmate was offered to decrease the dose of Lupron or discontinue Finasteride and/or spironolactone but he states that he wants to see the endocrinologist

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

first.   Endocrinology consult submitted."

Page 12

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

FTCA CLAIMS

The Bureau of Prisons Policy Statements are commands to Government employees (each Defendant), to discharge duties, tasks, and behavior in a particular and specific manner which do not involve matters of discretion, choice, or options.  Each of the Defendants' own negligence and/or Dereliction of Duty contributed to these claims. The negligent violations are thus follows:

1.) MEDICAL MALPRACTICE

Each of the defendant(s) have used their position of power to breach the prevailing professional standard of care for the health care provider. The defendant(s) have repeatedly denied Plaintiff the prescribed medical treatment recognized as necessary medical treatment within the medical community. Not one of the Non-Examining Physician(s)-(Supervisory/Medical BOP Employees) have ever examined Plaintiff and have no personal first hand knowledge as to the Plaintiff's serious medical condition, however continues to hinder Plaintiff's prescribed course of treatment.

2.) CONTINUING TORT

For medical malpractice actions, the discovery rule and the continuing tort rule apply.  An allegation of a failure to provide needed and requested medical attention constitutes a continuing tort, which does not accrue until the date medical attention is provided.

3.) NEGLIGENCE

To establish medical negligence under Florida Law:  The claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for the health care provider.  The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.  Florida law recognizes that physicians owe their patients a duty to use the ordinary skills, means and methods that are recognized as necessary and which are customarily followed in the particular type of case according to the standard of those who are qualified by training and experience to perform similar services in the community or in a similar community. The relevant inquiry is whether a physician breached his duty by failing to treat a patient in accordance with the standard of care required of him, and if so, whether this failure resulted in injuries to the Plaintiff.

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

Page 14

Each of the defendant(s) have repeatedly failed to provide Plaintiff with the prevailing professional standard of care for the treatment of Plaintiff's serious medical condition of Gender Dysphoria and/or have repeatedly prevented Plaintiff from receiving said prescribed medical treatment.  In the medical community the Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline and ("WPATH"), the World Professional Association for Transgender Health are the prevailing professional standards of care for the treatment of patients diagnosed and treated for the serious medical condition of gender dysphoria. Plaintiff's prescribed treatments have continued to be consistent with both Standards of Care, however the defendant(s) have repeatedly hindered such medical treatment for non-medical reasons. (See attached Endocrine Society Clinical Practice Guideline and ("WPATH"), Standards of Care)

4.) VIOLATION OF PROGRAM STATEMENT 1040.04§551.90, "NON-DISCRIMINATION TOWARD INMATES
        The rule cited in this Program Statement is contained in 28 CFR § 551.90
POLICY § 551.90.  Bureau staff shall not discriminate against inmates on the basis of race, religion, national origin, sex, disability, or political belief.  This includes the making of administrative decisions and providing access to work, housing and programs.]

Each of the defendant(s) have repeatedly discriminated against Plaintiff in her access to the prescribed medical treatment.  As such, Plaintiff's diagnosed serious medical condition is the only condition where the defendant(s) have refused to provide prescribed necessary medical treatment.  There is a custom and policy within the Bureau of Prisons whereas Transgender Inmates diagnosed and treated with the serious medical condition of Gender Dysphoria have never received surgical interventions even after being prescribed by competent medical professionals.  It is important to note that when Plaintiff's breast lumps where diagnosed the BOP defendant(s) did not hinder adequate medical care and did not get involved in Plaintiff's health care at all, however inmates's diagnosed and being treated for the serious medical condition of Gender Dysphora is not so lucky.  If Plaintiff had cancer, and was depressed and suicidal because of that disease, the BOP would discharge its duty to Plaintiff by treating both the cancer and the depression.  Plaintiff prescribed course of treatment deserve no less.

5.) VIOLATION OF PROGRAM STATEMENT 5200.04, "TRANSGENDER OFFENDER MANUAL
        The rule cited in this Program Statement is contained in 28 CFR part 115
The original (PS) 5200.04, "Transgender Offender Manual was implemented on January 18, 2017.
        On May 11, 2018, (PS) 5200.04 CN-1, "Transgender Offender Manual", was

implemented with change(s).

9. HORMONE AND NECESSARY MEDICAL TREATMENT

Hormone or other necessary medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff.  Medical staff should request consultation from Psychology services regarding the mental health benefits of hormone or other necessary medical treatment.  If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement Patient Care and relevant clinical guidance. Questions concerning hormone treatment may be referred to the TCCT."

Each of the defendant(s) are paying lip service concerning this policy.  Plaintiff's individualized prescribed medical treatment have yet to be approved by the defendant(s).

6.) VIOLATION OF PROGRAM STATEMENT 6010.05, "HEALTH SERVICES ADMINISTRATION

1. PURPOSE AND SCOPE

To deliver medically necessary health care to inmates effectively in accordance with proven  standards of care without compromising public safety concerns inherent to the Bureau's overall mission.

2. ADMINISTRATION

Providing health care within a correctional environment presents unique challenges not encountered by practitioners elsewhere.  The Health Services Division's goal is to provide medically necessary health care services.

On occasion, there may be an incompatibility between medical and correctional guidelines; conflicts related to medical care should be resolved, as far as practical, in favor of medicine.  At the same time, the medical staff must be part of the institution's correctional team.

a.  Delegation of Authority.  The Director's authority to provide for the care and treatment of persons charged or convicted of offenses against the United States has been delegated to the Assistant Director, Health Services Division (HSD).  The Assistant Director, HSD, directs and administers all activities related to the physical and psychiatric care of inmates, the Bureau's Safety and Environmental Health Program, and Food and Farm Services.

The Assistant Director, HSD, has delegated the clinical direction and administration of all activities related to the physical and psychiatric care of inmates to the Medical Director.  The Medical Director is the final health care authority for all clinical issues.

Due to the authority given to the defendant(s), Plaintiff's health care specifically, Plaintiff's prescribed surgical request denied and/or ignored just because the defendants have the authority to override Plaintiff's Treating Physician.  The defendant(s) does not

have a legitimate penological objective in denying and/or ignoring Plaintiff's prescribed surgical request(s).

7.) <u>VIOLATION OF PROGRAM STATEMENT 6031.04, "PATIENT CARE"</u>

The rule cited in this Program Statement is contained in 29 CFR, part 1910.95

1. PURPOSE AND SCOPE

To effectively deliver medically necessary health care to inmates.

2. PROGRAM OBJECTIVES

The expected result of this program is: Health care will be delivered to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the agency's overall mission.

30. INMATES WITH GENDER IDENTITY DISORDER

Inmates with a possible diagnosis of Gender Identity Disorder (GID), including inmates who assert they have GID, will receive thorough medical and mental health evaluations from medical professionals with basic competence in the assessment of DSM-IV/ICD-10 sexual disorders and who have participated in BOP's GID training, including the review of all available community health records. The evaluation will include an assessment of the inmate's treatment and life experiences prior to incarceration as well as ecperiences during incarceration (including hormone therapy, completed or in-process surgical interventions, real life experience consistent with the inmate's gender identity, private expressions that conform to the preferred gender, and counseling.)

If a diagnosis of GID is reached, a proposed treatment plan will be developed which promotes the physical and mental stability of the patient. The development of the treatment plan is not solely dependent on services provided or the inmate's life experiences prior to incarceration. The treatment plan may include elements or services that were, or were not, provided prior to incarceration, including, but not limited to: those elements of the real life experience consistent with the prison environment, hormone therapy, and counseling. Treatment plans will be reviewed regularly and updated as necessary.

Current, accepted standards of care will be used as a reference for developing the treatment plan. All appropriate treatment options prescribed for inmates with GID in currently accepted standards of care will be taken into consideration during evaluation by the appropriate medical and mental health care staff. Each treatment plan or denial of treatment must be reviewed by the Medical Director or the BOP Chief Psychiatrist. Hormone therapy must be requested through the non-formulary review process, and approved by the Medical Director and/or Chief Psychiatrist. Consultation with the Chief of Psychology prior to such approval may be appropriate in some cases.

In summary, inmates in the custody of the Bureau with a possible diagnosis of GID will

receive a current individualized assessment and evaluation.  Treatment options will not be precluded solely due to level of services received, or lack of services, prior to incarceration.

Each of the defendant(s) are paying lip service concerning this policy. Plaintiff's individualized prescribed medical treatment have yet to be approved by the defendant(s).

8.) VIOLATIONS OF ("WPATH"), STANDARDS OF CARE

XIV.  Applicability of the Standards of Care to People Living in Institutional Environments

The SOC in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation.  People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long-/intermediate-term health care facilities (Brown, 2009).  Health care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

All elements of assessment and treatment as described in the SOC can be provided to people living in institutions (Brown, 2009).  Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements.  If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized are of health care.

Reasonable accommodations to the institutional environment can be made in the delivery of care consistent with the SOC, if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria.  Denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the SOC (Brown, 2010).

Plaintiff's prescribed surgical inventions are consistent with the entire SOC, however each of the defendant(s) are hindering Plaintiff's prescribed course of treatment for non-medical reasons  and contrary to the SOC.  The Standards of Care considered an Additional Resources For Clinicians in the BOP Program Statement, 5200.04 CN-1, "Transgender Offender Manual", however each of the defendant(s) have refused to abide by the SOC. (See attached, ("WPATH"), Standards of Care)

9.) VIOLATION OF THE ENDOCRINE SOCIETY CLINICAL PRACTICE GUIDELINE

Gender affirmation is multidisciplinary treatment in which endocrinologists play an

important role.  Gender-dysphoric/gender-incongruent persons seek and/or are referred
to endocrinologists to develop the physical characteristics of the affirmed gender.
They require a safe and effective hormone regimen that will (1) suppress endogenous
sex hormone secretion determined by the person's genetic/gonadal sex and (2) maintain
sex hormone levels within the normal range for the person't affirmed gender.
For adult gender-dysphoric/gender-incongruent persons, the treating clinicans (collectively)
should have expertise in transgender-specific diagnostic criteria, mental health,
primary care, hormone treatment, and surgery, as needed by the patient.  We suggest
maintaining physiologic levels of gender-appropriate hormones and monitoring for known
risk  and complications.  When high doses of sex steroids are required to suppress
endogenous sex steroids and/or in advanced age, clinicians may consider surgically
removing natal gonads along with reducing sex steroid treatment.  Clinicans should
monitor both transgender males (female to male) and transgender females (male to female)
for reproductive organ cancer risk when surgical removal is imcomplete.  Additionally,
clinicans should persistently monitor adverse effects of sex steroids.  For gender-
affirming surgeries in adults, the treating physician must collaborate with and confirm
the criteria for treatment used by the referring physician.  Clinicans should avoid
harming individuals (via hormone treatment) who have conditions other than gender
dysphoria/gender incongruence and who may not benefit from the physical changes
associated with this treatment.

     5.0 Surgery for Sex Reassignment and Gender Confirmation
5.1  We recommend that a patient pursue genital gender-affirming surgery only after
MHP and the clinician responsible for endocrine transition therapy both agree that
surgery is medically necessary and would benefit the patient's overall health and/or
well being.

Plaintiff's General Treating Psychiatrist-(Dr. Todd Cornett, MD), Primary General
Treating Physician-(Dr. Inerio Alarcon, MD/CD), General Treating Physician-(Dr. Marta
Chipi, MD), Transgender Specialist Treating Physician-(Dr. Christopher Estes, OBGYN/CMO),
Transgender Specialist Examining Physician-(Dr. Eugenio Angueira-Serrano, MD), all
agree as to Plaintiff's course of treatment, thus the surgical inventions request.
The Plaintiff's Non-Examining Physician(s)-(Supervisory/Medical BOP Employees--the
Defendant(s), have repeatedly denied and/or ignored Plaintiff's prescribed surgical
invention request(s).

5.2  We advise that clinicans approve genital gender-affirming surgery only after
completion of at least 1 year of consistent and compliant hormone treatment, unless
hormone therapy is not desired or medically contraindicated.

Plaintiff's Treating Physician(s) are all in agreement that Plaintiff is medically

PAGE 5 IV. STATEMENT OF CLAIM CONTINUED

contraindicated from further estrogen therapy.

5.6 We suggest that clinicians determine the timing of breast surgery for transgender patients based upon the physical and mental health status of the individual. There is insufficient evidence to recommend a specific age requirement.

Plaintiff's Treating Physician(s) are all in agreement that Plaintiff is an appropriate candidate for breast augmentation surgery, thus the surgical request(s) submitted on 7/13/2017 and 9/28/2017.

Plaintiff's prescribed surgical interventions are consistent with the Endocrine Society Clinical Practice Guideline, however each of the defendant(s) are hindering Plaintiff's prescribed course of treatment for non-medical reasons and contrary to these guidelines. (See attached Endocrine Society Clinical Practice Guideline)

10.) VIOLATION OF PROGRAM STATEMENT 6311.04§549.50, "PLASTIC SURGERY AND IDENTIFICATION RECORDS

The rules cited in this Program Statement are contained in 28 CFR 549.50-52

1. [PURPOSE AND SCOPE § 549.50. In circumstances where plastic surgery is a component of a presently medically necessary standard of treatment or it is necessary for the good order and security of the institution, the necessary surgery may be performed.]

2. PROGRAM OBJECTIVES. The expected results of this program are:

a. Plastic surgery will be performed on an inmate only when it is a component of a presently medically necessary standard of treatment or necessary for the good order and security of the institution.

Each of the defendant(s) are paying lip service concerning this policy. Plaintiff's individualized prescribed medical treatment have yet to be approved by the defendant(s).


MEDICAL RECORDS ATTACHED TO THIS COMPLAINT

Attached to this complaint to support Plaintiff's claims are the relevant medical records as they pertain to Plaintiff's serious diagnosed and treating history for GENDER DYSPHORIA. Plaintiff's medical records are voluminous, whereas Plaintiff is in possession of several hundred copies of said medical records that has nothing to do with Plaintiff's serious diagnosed medical condition of GENDER DYSPHORIA. Plaintiff will promptly forward all medical records in her possession promptly if instructed to do so by this HONORABLE COURT. Plaintiff is unaware if it is appropriate to send several hundred irrelevant documents thereby placing an undue burden on this HONORABLE COURT.

_____

_____

_____

_____

**V.      Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Due to not receiving adequate treatment for my diagnosis of GENDER DYSPHORIA
Plaintiff suffers daily clinically significant depression, anxiety,
Suicidal Ideation, Emotional Distress, Excessive Preoccuption with
Genital Mutilation and Self-Castration, Tachycardia, Chest Pains, Atypical
Chest Pain, Pleuritic Chest Pain, Shortness of Breath, Nausea, Vomiting,
Nonspecific T Wave abnormality, Abnormal ECG, Abdominal Pain, Clinical
Palpable Mass positive for Florid Lobular Hyperplasia which is not usually
seen with Gynecomastia, Focal Pseudoangiomatose Stromal Hyperplasia-(PASH)
Sinus rhythm with 1st degree A-V block,          CONTINUED

**VI.     Relief**

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

FTCA CLAIM $100,000,000.00--(One Hundred Million Dollars),
BIVENS CLAIM $2,500,000.00--(Two Million Five Hundred Thousand Dollars)
from each of the Defendant(s).
Breast Augmentation and Orchiectomy as prescribed by Treating Transgender
Specialist Dr. Christopher Estes, OBGYN/CMO at Westchester General Hospital
performed by Transgender Specialist Surgeon Dr. Gregory Dowbak.   CONTINUED

**VII.    Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures.  Your case may be dismissed if you have not exhausted your administrative remedies.

6

PAGE  6 V. Injuries CONTINUED

V.      Injuries              CONTINUED

Plaintiff have not had Breast Augmentation and Orchiectomy as prescribed by Treating
Specialist Physician Dr. Christopher Estes, OBGYN/CMO as a medically necessary
treatments.

PAGE 6 VI. RELIEF CONTINUED

VI.     Relief                CONTINUED

Any other constitutionally adequate medical necessary treatment consistent with the Standards of Care deemed medically necessary by any of Plaintiff's Treating Physicians.

    Plaintiff receive a Personal Laser Hair-Removal Device for full body hair removal from Tria Beauty, INC.

    An action for Injunctive Relief/TRO will be filed by separate motion.

    ENJOIN Defendant(s) from enforcing the unconstitutional policies, customs, or practices that deny inmates with Gender Dysphoria individualized medically necessary treatment and care, which are contrary to widely accepted standards of care and the recommendations of Plaintiff's Specialist Treating Transgender Physician and other treating doctors.

A.    Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑    Yes

☐    No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

MIAMI FCI, MIAMI, FL

_____

_____

B.    Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑    Yes

☐    No

☐    Do not know

C.    Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☑    Yes

☐    No

☐    Do not know

If yes, which claim(s)?

Eighth Amendment Claim,Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Negligence, Respondent Superior, Vicarious Liability, Medical Malpractice, Continuing Tort.

D.    Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑    Yes

☐    No

7

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐   Yes

☐   No

E.   If you did file a grievance:

1.   Where did you file the grievance?

Miami FCI

2.   What did you claim in your grievance?

Eighth Amendment Violation, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Negligence, Respondent superior, Vicarious Liability, Medical Malpractice, Continuing Tort

3.   What was the result, if any?

Allege that BOP Transgender Clinical Care Team, (TCCT) is reviewing my surgery request for final disposition, however this request has been pending review since 2/2017, whereas no final disposition have been made.

4.   What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not.  *(Describe all efforts to appeal to the highest level of the grievance process.)*

I fully exhausted the BOP Grievance Process with the attached Remedy ID# 908238-F1/R1/A1 and the Federal Tort Claims Act with the attached Administrative Claim #Trt-SER-2018-01940.

8

F.   If you did not file a grievance:

    1.   If there are any reasons why you did not file a grievance, state them here:

       N/A

    2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

       N/A

G.   Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

    Please see attached exhausted Remedy ID# 908238-F1/R1/A1 and Administrative Claim #TRT-SER-2018-01940.

    CONTINUED PLEASE SEE ATTACHED

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII. Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

    ☐   Yes

    ☑   No

## PAGE 9 CONTINUED

G.      Please set forth any additional information that is relevant to
        the exhaustion of your administrative remedies.


   On June 17, 2018, Administrative Claim #TRT-SER-2018-01940 was due
to be responded to, however Plaintiff has received no response. Accordingly
Administrative Claim #TRT-SER-2018-01940 is presumed to be denied.
   Under the FTCA, an "action shall not be instituted upon a claim
against the United States for money damages" unless a plaintiff has
exhausted administrative remedies by filing a claim with the appropriate
federal agency within two years of the act or injury. 28 U.S.C. § 2675(a).
Thus, only after an administrative claim is denied, or deem denied,
may a claimant file an action in federal court. Id.; see also McNeil v.
United States, 508 U.S. 106, 113, 113 S. Ct. 1980, 124 L. Ed. 2d (1993)
("the FTCA bars claimants from bringing suit in federal court until
they have exhausted their administrative remedies.")  If the agency
does not respond to the administrative claim within six months, the
claimant may consider the lack of decision to be a denial, and initiate
a civil action. 28 U.S.C. § 2675(a).

If so, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

> See attached order from Case 1:17-cv-24736-MGC, dated
> 5/31/2018. The order does not states whether case count as
> strike. (See Attached)

A.   Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

    ☑   Yes

    ☐   No

B.   If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

    1.   Parties to the previous lawsuit

        Plaintiff(s)   CHRISTOPHER SHORTER

        Defendant(s)   Mark S. Inch, Dr. Deborah G. Schult, DHD, Dr. Jeffery D. Allen, MD, (TCCT), J.A. Keller, CDR Todd Crawford, Dr. angel Ortiz, MD, and Warden Bryan Dobbs.

    2.   Court *(if federal court, name the district; if state court, name the county and State)*

        United States District Court For The Southern District of Florida

    3.   Docket or index number

        1:17-cv-24736-MGC

    4.   Name of Judge assigned to your case

        HONORABLE MARCIA G. COOKE

    5.   Approximate date of filing lawsuit

        12/27/2017

    6.   Is the case still pending?

        ☐   Yes

        ☑   No

        If no, give the approximate date of disposition.   5/31/2018

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No: 17-24736-Civ-COOKE/WHITE

CHRISTOPHER SHORTER,

      Plaintiff,

vs.

MARK S. INCH, *BOP, Director,*
*et al.,*

      Defendants.

_____/

### ORDER DISMISSING CASE WITHOUT PREJUDICE

      THIS MATTER is before me on an independent review of the record. On April 10, 2018, I entered an Order Adopting in Part Report of Magistrate Judge (ECF No. 16), wherein I adopted Judge White's Report of Magistrate Judge (ECF No. 7) in so far as it recommended denial of Plaintiff's Emergency Motion for Declaratory Judgment/Injunctive Relief/Temporary Restraining Order Pursuant to Fed. R. Civ. P. 57 and Fed. R. Civ. P. 65 ("Motion") (ECF No. 1). However, I denied Plaintiff's Motion without prejudice and allowed Plaintiff to file a complaint within twenty-one days. As of the date of this Order, twenty-one days have passed and Plaintiff has not filed a complaint.[1]

      It is, therefore, **ORDERED and ADJUDGED** that the instant case is **DISMISSED** *without prejudice*. The Clerk of Court shall **CLOSE** this case. All pending motions, if any, are **DENIED** *as moot*.

      **DONE and ORDERED** in chambers, at Miami, Florida, this 31st day of May 2018.

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Patrick A. White, U.S. Magistrate Judge*
*Christopher Shorter*, pro se

_____

[1] Plaintiff filed a Motion for Extension of Time (ECF No. 17) on April 23, 2018, which was denied. *See* Order Denying Plaintiff's Motion for Extension of Time, ECF No. 18.

1

7.  What was the result of the case?  *(For example:  Was the case dismissed?  Was judgment entered in your favor?  Was the case appealed?)*

DISMISSED WITHOUT PREJUDICE

C.  Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

☑  Yes

☐  No

D.  If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.  Parties to the previous lawsuit

Plaintiff(s)  CHRISTOPHER SHORTER

Defendant(s)  Warden Billy Romero, (AW) Stevie Knight, Captain Deborah Colon, Chaplain C. Waweru

2.  Court *(if federal court, name the district; if state court, name the county and State)*

United States District court For The Southern District of Florida

3.  Docket or index number

1:17-cv-21244-UU

4.  Name of Judge assigned to your case

HONORABLE URSULA UNGARO

5.  Approximate date of filing lawsuit

4/4/2017

6.  Is the case still pending?

☑  Yes

☐  No

11

PAGE 11 CONTINUED

D.      CONTINUED

        1.      Parties to the previous lawsuit

                Plaintiff(s)          CHRISTOPHER SHORTER
                Defendant(s)          Warden Billy Romero, (AW) Stevie Knight
                                      Captain Deborah Colon, Sean McNeel,
                                      Lietutenant, M. Morel (AHSA), Lupe
                                      Sierra (HIT)

        2.      Court

                United States District Court For The Southern District Of
                Florida

        3.      Docket or index number

                1:17-24476-UU

        4.      Name of Judge assigned to your case

                HONORABLE URSULA UNGARO

        5.      Approxiamte date of filing lawsuit

                4/4/2017

        6.      Is the case still pending?

                YES

        7.      What was the result of the case?

                PENDING

If no, give the approximate date of disposition. _____

7.    What was the result of the case?  *(For example:  Was the case dismissed? Was judgment entered in your favor?  Was the case appealed?)*

PENDING _____

_____

## IX.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  10 \ 18 , 20 18.

USPS TRACKING #   **9114 9011 8986 6469 2797 98**
& CUSTOMER                For Tracking or inquiries go to USPS.com
RECEIPT LABEL (ROLL)     or call 1-800-222-1811.

Signature of Plaintiff    _____

Printed Name of Plaintiff    CHRISTOPHER SHORTER

Prison Identification #    21344-017

Prison Address    FCI Miami, PO BOX 779800

| Miami | Florida | 33177 |
|-------|---------|-------|
| City | State | Zip Code |

### B.    For Attorneys

Date of signing: _____, 20___.

Signature of Attorney    _____

Printed Name of Attorney    _____

Bar Number    _____

Name of Law Firm    _____

12

For Domestic and Inter...

Visit us at usps.com

INTERNATIONAL RESTRICTIONS APPLY.
20-POUND WEIGHT LIMIT
ON INTERNATIONAL APPLIES

Customs forms are required.
Consult the *International Mail Manual (IMM)*
at *pe.usps.gov* or ask a retail associate
for details.

USMS INSPECTED

From:

◇21344-017◇

To:   Destination:

Christophe Shorter
Federal Correctional Institution
PO BOX 779800
Miami, FL 33177
United States

Country of Destination:   *Pays de destination:*

◇21344-017◇

Clerk Us District Court
400 N Miami AVE
8th Floor
Miami, FL 33128
United States

UNITED STATES
POSTAL SERVICE®

USPS TRACKING #

9114 9011 8986 6469 2797 98